# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
                               )
         Plaintiff, )
                               )
v. )         Case No. CR-12-061-RAW
                               )
MICHAEL SCOTT CALHOUN; )
TOMMY WAYNE DAVIS; )
WILLIAM JEFFREY TUCKER; )
JAMES DEAN KAYVONFAR; and )
CHARLES MATTHEW SPIRES, )
                               )
         Defendants. )

## **FINDINGS AND RECOMMENDATION**

On May 13, 2013, this Court conducted a hearing on the following Motions:

- Motion to Quash Indictment and Suppress Testimony filed by Defendant Michael Scott Calhoun on May 2, 2013 (Docket Entry #130);

- Joinder of Motion to Quash Indictment filed by Defendant William Jeffrey Tucker on May 6, 2013 (Docket Entry #133);

- Motion to Adopt Motion to Quash filed by Defendant Charles Matthew Spires on May 7, 2013 (Docket Entry #135); and

- Joinder in Co-Defendants' Motion to Quash filed by Defendant Tommy Wayne Davis on May 8, 2013 (Docket Entry #140).

These Motions were referred to the undersigned by presiding

United States District Judge Ronald A. White by Orders entered May 3, 8 and 9, 2013.  Upon review of the briefing filed by the parties and consideration of the evidence presented at the hearing, this Court enters these Findings and Recommendation.

On August 15, 2012, the grand jury returned a 60 count indictment against Defendants.  The charges included Count One - Conspiracy to Commit Wire Fraud/Mail Fraud in violation of 18 U.S.C. § 1349, Counts Two through Thirty One - Wire Fraud in violation of 18 U.S.C. § 1343, and Counts Thirty Two through Sixty – Mail Fraud in violation of 18 U.S.C. § 1341.  Defendants were alleged to have defrauded Texas Capital Bank (the "Bank"), a financial institution insured by the Federal Deposit Insurance Corporation,  through the Tri-County Autoplex and T or T Auto, automobile dealerships located in Hugo, Oklahoma.  The Government alleges between August of 2007 and April of 2010, Defendants engaged in a scheme to defraud the Bank by obtaining a line of credit from the Bank and providing false or misleading information concerning vehicles such that it appeared the vehicles were in the dealership's inventory when, in fact,  they were not.  The Government contends Defendants utilized the mail and wire transfers to assist in the scheme to defraud the Bank.

The sole witness called at the hearing on Defendants' Motions was Defendant Michael Scott Calhoun ("Calhoun").  Calhoun was employed at the Tri-County Autoplex as the General Manager.  In May

of 2010, civil litigation ensued between the Bank and the owners and operators of Tri-County Autoplex in both Oklahoma and Texas state courts, each alleging fraud in their relationship. Calhoun was a named defendant in this civil litigation. As a result, he retained the services of a Texas attorney identified as Larry Friedman ("Friedman") to represent him in the litigation. Mr. Friedman was admittedly versed in civil practice but was not a criminal attorney. Ultimately, a civil judgment was entered against the Bank for some $65 million in actual and punitive damages. The jury in the civil case found the Bank to be a participant in the fraudulent conduct, acting through its loan officer, Clint Kuykendall ("Kuykendall"), to make Tri-County Autoplex appear current on the loan with the Bank and properly secured on the obligation.

In 2011, Calhoun received a letter advising him that he was a target of a grand jury investigation as well as a subpoena. Calhoun called and spoke with a woman – presumably with the United States Attorney's Office although Calhoun stated he called "the court as instructed on the subpoena. He informed the unidentified woman that he would cooperate and appear voluntarily.

Subsequently, Calhoun was contacted by FBI Agent Jeff Youngblood. Agent Youngblood asked if Calhoun was going to cooperate and Calhoun informed him he would do so but that he needed legal counsel. Calhoun told Agent Youngblood that he had

3

used all of his money in the civil litigation so he would need assistance in retaining criminal counsel in Oklahoma. On August 19, 2011, this Court appointed Rex Earl Starr to represent Calhoun after receiving notification from the Federal Public Defender that he was a target of the grand jury. Mr. Starr contacted Calhoun but informed him he would be on vacation until the end of the month. Calhoun testified that Mr. Starr did nothing further action during his representation.

During this same time period, the civil judgment was entered against the Bank. Mr. Friedman informed Calhoun that he was going to contact the Bank and have them retain and pay for criminal counsel for Calhoun. Mr. Friedman also prepared a document entitled "Affidavit of Non-Prosecution" to have the Bank sign. Mr. Friedman told Calhoun that he could help the Bank overturn the civil verdict with his testimony concerning the activities between the automobile dealership and the Bank and that the Bank should be willing to pay for counsel. Mr. Friedman told Calhoun that if he is indicted as a result of his cooperation and testimony, he would receive probation. Thereafter, Calhoun terminated Mr. Starr's representation and Robert Wyatt was retained for Calhoun and paid by the Bank. Calhoun testified that Mr. Wyatt was selected by Stephen Jones, an attorney representing the Bank.

Mr. Wyatt represented Calhoun for approximately two months in the Fall of 2011. Mr. Wyatt told Calhoun the best thing he could

do is cooperate with the federal authorities. Calhoun stated that Mr. Wyatt spoke with Ryan Roberts, the Assistant United States Attorney, and negotiated a plea deal wherein Calhoun would plea to a one count indictment with his sentence capped at 60 months. Mr. Wyatt told Calhoun that he would also seek a downward departure for substantial assistance. Calhoun told Mr. Wyatt that the deal "was not good enough." Calhoun believed the Bank had just had a judgment entered against it in the civil litigation which could have been avoided if it had sought help from others in the litigation.

Mr. Wyatt set up two separate meetings with the FBI but Calhoun refused to appear. Calhoun testified that Mr. Wyatt was aware of Calhoun's financial difficulties which might result in the loss of his home and stated he could possibly have the Bank refinance the mortgage on his home but that Calhoun needed to cooperate with the FBI and take the deal. Mr. Friedman advised Calhoun to fire Mr. Wyatt. Mr. Wyatt told Calhoun that Mr. Friedman's efforts had been "fruitless" and that the documents that Mr. Friedman prepared would do him no good. Calhoun terminated Mr. Wyatt's services.

After the cessation of Mr. Wyatt's representation, Mr. Friedman contacted that Bank and had them hire Tom Mills, an attorney from Dallas, Texas to represent Calhoun in the criminal matter in late December of 2011 or early January of 2012. Again,

5

the Bank paid for Mr. Mills' legal representation.

Mr. Mills met Calhoun in Mr. Friedman's office in Dallas, Texas. Mr. Friedman told Mr. Mills that he believed that because of Calhoun's anticipated assistance in overturning the civil judgment against the Bank, Calhoun should not be prosecuted or, if he is prosecuted, he should receive probation. Mr. Mills agreed and said it should not be a problem. Calhoun believed that he would not be prosecuted and that he was receiving "the perfect deal" with the Bank paying for his criminal attorney and Calhoun avoiding prosecution and jail.

Mr. Mills, Mr. Friedman, and Calhoun met with the Bank's attorneys. Mr. Friedman made a brief appearance. The Bank's attorney was to contact the United States Attorney's Office on Calhoun's behalf and tell them that the Bank did not want Calhoun prosecuted because he was helping the Bank "recover their loss."

Mr. Mills then set up a meeting with Agent Youngblood and an associate in Durant, Oklahoma in January or February of 2012. At the meeting, Mr. Mills told Agent Youngblood that the Bank did not want Calhoun prosecuted to which Agent Youngblood responded "he had heard that before." Calhoun's "impression" of the exchange was that he would not be prosecuted.

On January 19, 2012, Calhoun then gave Agent Youngblood an allegedly full, truthful, and complete statement of the activity between the Bank and the dealership. Calhoun's statement

incriminated himself in fraudulent activity.

On February 15, 2012, Calhoun was to testify before the grand jury. He still believed that he might not be indicted. Mr. Mills told Calhoun that he was working on a deal with Assistant United States Attorney Roberts but that Mr. Roberts could not announce probation for Calhoun until everyone else in the case had been tried and sentenced. Then, Mr. Mills allegedly told Calhoun that after he gave substantial assistance he would receive probation.

Calhoun then testified before the grand jury. Mr. Roberts asked Calhoun before the grand jury if he understood that he had a deal with the Government that in exchange for taking responsibility for his criminal conduct and testifying against others, Calhoun would plea to a one count indictment for conspiracy to defraud a financial institution and his exposure to incarceration would be capped at five years. Mr. Roberts also stated that if Calhoun provided substantial assistance the Government might even file a motion with the court to ask that Calhoun get even less time than the five years. Calhoun acknowledged all of these statements before the grand jury. Calhoun testified at the hearing, however, that he believed that a downward departure and substantial assistance would get him to probation at the worst.

Calhoun incriminated himself and others in his testimony before the grand jury. Calhoun stated that the testimony he provided to the grand jury was truthful in all respects.

Calhoun and the other Defendants were indicted on August 15, 2012. Mr. Mills encouraged Calhoun to plead guilty to a Felony Information which was filed on November 27, 2012. On the way to the courthouse for a change of plea hearing on November 30, 2012, Calhoun refused to plead to the information. Mr. Mills was allowed to withdraw as Calhoun's counsel of record on December 11, 2012. On January 14, 2013, James Wilcoxen was appointed as Calhoun's counsel and remains in that capacity in this case.

Calhoun testified that once he terminated Mr. Mills' representation, he requested and received his case file. After reviewing the file, Calhoun found a letter from Stephen Jones, attorney for the Bank, to Mr. Mills dated June 11, 2012. *See* Exhibit C to Defendant Calhoun's Reply (Docket Entry #147). In the letter, Mr. Jones writes that he had informed the Bank of Mr. Mills' latest billing of over $27,000.00 and that a check would be issued after the money was wired to him. Mr. Jones also sought to clarify the payment arrangement with the Bank. He wrote, in pertinent part:

> First, our agreement was that we would pay for Mike Calhoun's reasonable, ordinary and necessary fees and expenses if he was cooperating with federal and/or state law enforcement agents or prosecutors in their investigation. Texas Capital Bank will not pay, nor did it agree to pay, for any work performed by Mike's criminal defense attorney which represents an effort to prepare for trial on an indictment. In other words, we encourage his cooperation, but the Bank will not pay for a defense for someone who is fighting an indictment where the Bank itself is the victim. . . .

Mr. Jones also complained that Calhoun had not yet been made available to be "debriefed" by the Bank's attorneys and investigators in relation to the civil litigation. Mr. Jones wrote that the Bank did not consider the preparation of a proposed indictment by Mr. Mills to be an appropriate expense for the Bank to pay, as it was also not part of the agreement for paying Calhoun's legal expenses. Mr. Jones concluded the letter by stating

> Texas Capital Bank cannot continue to pay for ancillary services regarding depositions, reviewing depositions, and similar matters. With the payment of your current bill, the Bank has paid almost $200,000 for Mike Calhoun's legal representation in a criminal investigation when he (1) has yet to be indicted, (2) yet to be debriefed by the Bank, (3) yet to sign a plea agreement.

Mr. Jones, on behalf of the Bank, requested an outline of the remaining work to be done, when Calhoun could be interviewed, when he was likely to sign a plea agreement, and "when these matters will be terminated." The Bank sought a litigation budget from Mr. Mills.

Mr. Mills responded on June 15, 2012 to Mr. Jones' letter by stating

> [a]t no time in the past or present, or anticipated in the future have I ever billed, nor will I, for defending Mike [Calhoun] against criminal charges. He is cooperating with the federal government, the state government and will be debriefed by the bank and will testify for the bank as requested. I do not know where that thought came from, but if it came from me, it was a miscommunication. If Mike ever "blows up" and says he wants a trial, I know that I will not be paid for such

9

> representation. He has never indicated that he was going to go that course.
>
> * * *
>
> Reviewing depositions and testimony in order to prepare Mike to be prepared to answer questions form you, Terri Roberts, civil attorneys and criminal defense attorneys is not "ancillary." It is vital.
>
> *See* Exhibit D to Defendant Calhoun's Reply (Docket Entry #147).

Despite these sentiments from the Bank, Calhoun testified that Mr. Mills had told him on several occasions that his loyalties were with Calhoun and not the Bank which was paying his bills. Nothing in the record indicates Mr. Mills exhibited divided loyalties in his representation of Calhoun's interests as Mr. Mills knew them to be at the time and his pecuniary interest in receiving payment from the Bank.

The Sixth Amendment to the United States Constitution assures the right to legal counsel "when adversary judicial criminal proceedings are initiated against a defendant." United States v. Washington, 619 F.3d 1252, 1260 (10th Cir. 2010). This guarantee of effective assistance of counsel "requires the guiding hand of counsel at every step in the proceedings against him." Id. quoting Kimmelman v. Morrison, 477 U.S. 365, 380 n.5 (1986). The purpose of this guarantee "is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." Id. citing Rothgery v. Gillespie Co., 554 U.S. 191, 234 (2008).

Clearly, Calhoun was represented throughout the preliminary portions of the proceedings against him.  Thus, his right to counsel was not denied.  Rather, he now asserts that the attorneys representing him possessed a conflict of interest as a result of receiving their compensation from the Bank.  The Tenth Circuit has recently discussed the requirements for findings an actual conflict of interest in the case of United States v. Flood, 2013 WL 1911298 (10th Cir.(Utah)).  The required standard is succinctly summarized by the court when it stated

> The Supreme court has warned of "the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party." [Wood v. Georgia 450 U.S. 261, 268-69 (1981)].  However, a third-party fee arrangement does not automatically create a conflict of interest.  *See* United States v. Alvarez, 137 F.3d 1249, 1252 (10th Cir. 1998); *see also* [Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)].  "An actual conflict of interest exists only if counsel was forced to make choices advancing interests to the detriment of his client." Workman v. Mullin, 342 F.3d 1100, 1107 (10th Cir. 2003)(quotation omitted).  In other words, there must be more than a potential conflict of interest or "a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. 162, 171 (2002).  To prevail, the defendant "has the burden of showing specific instances to support [his] claim of actual conflict of interest." Edens v. Hannigan, 87 F.3d 1109, 1114 (10th Cir. 1996); *accord* Castro v. Ward, 138 F.3d 810, 821 (10th Cir. 1998).
>
> United States v. Flood, 2013 WL 1911298, 4 (10th Cir.(Utah))(bracketed information added by this Court).

Mr. Wyatt and Mr. Mills advanced Calhoun's interests in this criminal proceeding by negotiating with the Government for a reduced, capped sentence in exchange for cooperation and a plea.  Indeed, the indictment originally charged Calhoun in Count One,

Counts 12 through 60 and the Government announced at the arraignment on the indictment a possible sentence of 30 years incarceration on each of three counts, a $1 million fine on each and 6 years of supervised release. As is apparent, the negotiated sentence cap represented a substantial reduction in the possible range of sentence on the charges alleged against Calhoun. Calhoun's belief and hope that he would either not be indicted or would be indicted but receive probation stemmed largely from the advice of his civil counsel. While his criminal attorneys certainly hoped that this would be the result, nothing from the Government or from his attorneys assured that this best case scenario had been achieved. Agent Youngblood, while acknowledging the desire of the Bank that Calhoun not be prosecuted, certainly did not assure this result. Mr. Roberts was transparent and careful in his admonition and recitation before the grand jury to include the deal that he had offered and only the deal that he had offered - not the one Calhoun wanted. Mr. Roberts did not indicate at any time that probation or non-prosecution was considered. Both Mr. Wyatt and Mr. Mills negotiated the same cap on Calhoun's sentence.

As stated in the case authority, the burden rests upon Calhoun to demonstrate specific instances of an actual conflict of interest. The primary evidence of such a conflict is contained in the correspondence exchange between Stephen Jones and Mr. Mills.

This exchange does give this Court pause. The potential ethical and professional ramifications for the attorneys involved are myriad and this Court certainly does not condone the mercenary tenor or the callous flavor of the content of these communications. As evidence of an actual conflict of interest, however, this exchange falls short. The plea deal Mr. Mills negotiated was by all accounts favorable to Calhoun given the charges and potential sentence that he faced. When Mr. Mills was confronted with Calhoun's refusal to accept the deal as negotiated with Mr. Roberts, he withdrew from further representation of Calhoun. He did not attempt to further the Bank's interests to Calhoun's detriment. In short, Calhoun simply was never offered and was not assured the plea deal he wanted by the Government or his attorneys, much that he might have wished it to be so. Calhoun's evidence of a conflict of interest does not rise to the required level for quashing the indictment or suppressing his statements made to the Government and the grand jury.

IT IS THEREFORE THE RECOMMENDATION OF THIS COURT that Defendants' Motions (Docket Entry Nos. 130, 133, 135, and 140) be **DENIED**.

The parties are herewith given fourteen (14) days from the date of the service of these Findings and Recommendation to file with the Clerk of the court any objections, with supporting brief. Failure to object to these Findings and Recommendation within

fourteen (14) days will preclude appellate review of the judgment of the District Court based on such findings.

IT IS SO ORDERED this 16th day of May, 2013.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE